### PLATT v. PHILADELPHIA & R. R. CO. et al.

(Circuit Court, E. D. Pennsylvania. October 29, 1894.)

No. 1.

1. RAILROAD—RECEIVERS—AGREEMENT FOR PLAN OF REORGANIZATION—WHEN ALLOWED.

The court will approve the petition of the receivers of a railroad company asking for leave to enter into an agreement for partial readjustment of the affairs of the company, when it appears that such agreement will put the stockholders and creditors of the company under no constraint as to the acceptance or rejection of a related plan of reorganization, nor will approval or disapproval of the proposed plan be implied in the order of the court.

2. PLAN OF REORGANIZATION—COMMISSION ON ADVANCES.

Where a syndicate proposes to effect a plan of reorganization of a railway company which is in the hands of receivers by the advancement of funds for the purchase of overdue coupons and interest, the court will, under the circumstances surrounding this case, grant permission to the receivers to pay the said syndicate 2½ per cent. commission upon the money so advanced in case the said plan become effective.

3. RECEIVERSHIP—TERMINATION OF.

A court of equity will regard with satisfaction any legitimate effort to terminate a receivership of a railroad corporation which has existed for two years. The appointment of receivers is a temporary remedy, and, in the event of the parties interested failing to provide a means for their discharge within a reasonable time, a court of equity will, of its own volition, take into consideration the question of a dissolution of the receivership.

This was a petition of the receivers of the Philadelphia & Reading Railroad Company and the Philadelphia & Reading Coal· & Iron Company, together with the Philadelphia & Reading Railroad Company, for authority to enter into an agreement for the partial readjustment of the affairs of the Philadelphia & Reading Railroad and Coal· & Iron Companies, and to make the payments therein provided if the plan be carried· into effect. The petition was referred to George L. Crawford, Esq., as special master, whose report follows, containing the terms of the said agreement and his comments thereon, with a recommendation that the prayer of the petition should be granted:

After the hearing of the argument upon the said petition, after due advertisement, had begun on October 15, 1894, before the court, its then pre-

occupation with jury trials caused it to refer that hearing to me, and the parties appearing thereupon adjourned to my office, 606 Chestnut street, Philadelphia, October 15, 1894, 12 m., for that purpose, whereat then appeared C. Stuart Patterson, Esq., for Mr. Platt; Samuel Dickson, Esq., for the Philadelphia & Reading Coal & Iron Company and the Philadelphia & Reading Railroad Company, and the receivers; Messrs. Sulzberger, Johnson, Carey & Reeves, of counsel for the reorganization committee of Mr. Olcott; John R. Dos Passos and Charles B. McMichael, Esqs., for the Fitzgerald committee, intervening with petition on behalf of Mr. Whitney, a general mortgage bondholder; Nathan Bijur, Esq., for the Hartshorne committee; Francis I. Gowen, Esq., for the Lehigh Valley Railroad Company; John B. Gleason, Esq., for George L. Rogers, a first preference income bondholder, intervening by petition,—and when and where the argument upon said petition was proceeded with. Mr. Dos Passos then presented the intervening petition hereto annexed, marked "Exhibit B." He also called upon the counsel for the receivers to produce, and they produced, the resolution of the Philadelphia & Reading Railroad Company touching the proposed plan, a copy whereof is hereto annexed, marked "Exhibit C." A copy of the proposed plan, in the form of an agreement between the general mortgage bondholders, income mortgage bondholders, and stockholders, and their committee of readjustment, and a copy of the proposed agreement between that committee and the petitioners, are annexed to the said petition as a part thereof.

The present receivers have been appointed upon a class bill for foreclosure, filed by a holder of third preference income bonds of the Philadelphia & Reading Railroad and Coal & Iron Companies. They have outstanding prior general mortgage bonds, amounting to $44,491,188.77, bearing 4 per cent. interest, maturing semiannually, January and July 1st, which for the past 18 months is in arrear and unpaid. The receivers, under an order made July 6, 1893, authorizing them to issue receivers' certificates, have issued them to the amount of $3,640,000. The Philadelphia & Reading Railroad Company also owe other general, well-secured indebtedness to the amount of $3,843,000, and further indebtedness, with interest, aggregating $7,533,000 for necessary equipment, for which a large part of the value thereof has been paid, leaving a valuable equity of the company therein over the said debt therefor. The receivers, upon the payment of the said secured general indebtedness, will have $10,000,000 of 5 per cent. collateral trust gold bonds of the Philadelphia & Reading Railroad Company, secured by stocks and bonds of its associated companies, which are a valuable and necessary part of its system, to dispose of for payment of the said classes of indebtedness, which, by reason of priority of liens, or value of securities pledged therefor, are entitled to a preference in the disposition of the proceeds of the said collateral trust bonds, over other indebtedness of the company.

Some of the said general mortgage bondholders have combined to enforce foreclosure of their mortgage, under due legal proceedings. The said plan of readjustment proposes, in substance: (1) The formation of a committee for readjustment to carry out the plan, fix the time to be given for its approval by the parties in interest, with the board of managers of the railroad company, to determine whether a sufficient amount of income bondholders and stockholders have assented thereto to make it effective, or to declare it abandoned, and to determine the form of the writings and do the acts requisite to carry it into effect if practicable. (2) That the general mortgage bondholders shall sell to the committee 10 coupons or interest on their bonds, accruing from July 1, 1893, to January 1, 1898, both inclusive, the committee if they find the plan to become effective, to abandon foreclosure proceedings, unless default should occur in payment of the interest on said bonds, other than the interest already in default, or in payment of the purchased coupons or interest and interest thereon, as provided by the plan, or in payment of the interest accruing after January 1, 1898. (3) That the income bondholders shall purchase to the amount of 10 per cent. of their holdings said 5 per cent. collateral trust gold bonds at par, paying therefor when required by the committee, and depositing their bonds with the committee as security therefor, or immediately paying said 10 per cent.

purchase money, and in either case receiving in exchange a proper negotiable receipt for said trust bonds when ready for delivery; or pay 3 per cent. of their holdings without receiving any of said trust bonds. (4) That the stockholders shall contribute 10 per cent. of the par of their stock in purchase of that amount of said collateral trust bonds at par, or $1.50 per share, without receiving any of said trust bonds, their stock to be assigned to a trustee as registered owner, and they receiving a certificate from the trustee for their equitable interest, said trustee to vote upon the said stock for one-half of the board of managers and president, as directed by resolution of a meeting of the general mortgage bondholders, and for the other half of the board as directed by resolution of a meeting of the holders of the assenting trust certificates, until the coupons and interest of the general mortgage bondholders purchased by the committee be paid, after which the trustee shall vote, until payment of the principal of the general mortgage bonds, for one-third of the board, as directed by the meeting of the general mortgage bondholders, for another third by the income mortgage bondholders, and the remaining third of the board and the president by the holders of the assenting trust certificates. (5) That, if the plan be abandoned, and foreclosure take place, the committee shall, on reorganization by them after sale, recognize the income mortgage bondholders and stockholders assenting to the plan, or, at the option of the committee, return them their securities and amounts paid thereon.

The proposed agreement between the said committee and the receivers and the Philadelphia & Reading Railroad Company recites that the committee, to insure the carrying of the plan into effect, has organized a syndicate to advance the money to purchase the said accrued coupons and interest on the general mortgage bonds at par from such holders thereof as prefer to receive the cash therefor, and a second syndicate to purchase said collateral trust bonds not taken by the assenting income bondholders and stockholders at 70 per cent. of their par value, provided that a guaranty commission of 2½ per cent. be paid to each of said syndicates, and provides: (1) That the first-mentioned syndicate shall buy the said coupons and interest maturing on the general mortgage bonds for 5 years from July 1, 1893, inclusive, with the accrued interest thereon, and hold them for 10 years from the date of purchase, upon condition that the holders of the accompanying bonds shall sign the bondholders' agreement of May 7, 1894 (providing for foreclosure), and present their bonds to be stamped under the terms of the said readjustment agreement. (2) That the receivers and railroad company shall pay the interest accrued on the coupons and interest in default, and thereafter semiannually on the par of the purchased coupons and interest, at the rate of 6 per cent. per annum. (3) That the Philadelphia & Reading Railroad Company, and, if the plan be duly declared effective, the receivers, shall pay the said 2½ per cent. commission upon the amount underwritten for the purchase of the said coupons and interest. (4) The purchasers shall hold them with all their rights, except of foreclosure, unless default occur under this agreement, or under the general mortgage, other than what has already occurred, or sufficient of the junior security holders shall not consent to the readjustment agreement, to make it effective in the judgment of the committee and board. (5) That the receivers and railroad company shall devote its surplus earnings to retire the said purchased coupons and interest at the rate of 105 and accrued interest, within 10 years from the date of the purchase. (6) That if sufficient bondholders and stockholders shall assent to the plan to make it effective in the judgment of the committee and board, without foreclosure, the railroad company shall sell and deliver its collateral trust bonds not subscribed for as aforesaid at 70 per cent. to the second-mentioned syndicate, and pay it a guaranty commission of 2½ per cent. upon said $10,000,000 collateral trust bonds, and shall apply all sums received from the syndicate and income bondholders and stockholders to the payment of the receivers' certificates and the secured floating debt, and the balance to the reduction of the equipment notes and car trusts. (7) If the plan of readjustment should not become effective, the railroad company shall repay to the said committee their expenses incurred in putting forth and advertising the plan.

Mr. Gowen, on behalf of the Lehigh Valley Railroad Company, desired

to have on the record simply that it had a large claim against the Phila-. delphia & Reading Railroad Company and receivers, not provided for by the plan, and that the Lehigh Valley Railroad Company did not wish to inter- fere with its consummation.

Mr. Gleason submitted that the proposed payment of commissions was in violation of the provisions of the income mortgages, limiting the subjects to which the earnings of the company were to be appropriated; but upon Mr. Dickson stating that the board would not declare the scheme effective unless a sufficient number of income mortgage bondholders and stockholders should agree, so as to substantially realize $9,750,000 from the collateral trust bonds, Mr. Gleason stated that, if convinced of this, he would with- draw his objections.

The only further opposition, after full advertisement of the application had, was from Mr. Bijur, representing the Hartshorne committee, Mrs. Hetty Green, and Mr. Isaac L. Rice; and Messrs. Dos Passos and Charles B. McMichael, representing the Fitzgerald committee; and Messrs. Kissan, Whitney & Co., general mortgage bondholders. It did not appear what extent of interests were represented by these committees.

Messrs. Bijur and Dos Passos submitted: (1) That the petition asked the court to approve of what was substantially a plan of reorganization, and not of administration, making the receivers its partisans, with power to en- force assent from parties in interest, and the granting of the prayer of the petition would be misunderstood by the press and by Englishmen, under whose system such reorganizations are approved by their courts and made obligatory. (2) That the court has no jurisdiction or power to authorize the receivers to become parties to any plan of reorganization, particularly if opposed, and the right of a single minority security holder must be consid- ered as much as those of the majority, referring to the master's fourteenth report, filed April 1, 1885, in the Kelsey Case; Central Trust Co. v. Wabash, etc., R. Co., 25 Fed. 70; an opinion of Mr. Justice Jackson in the United States circuit court of Georgia in the case of Clark v. Railroad Co., 66 Fed. 16, ren- dered May 26, 1893; Chable v. Construction Co. 59 Fed. 846; and Judge La- combe's opinion in Fowler v. Mortgage Co. (Oct. 2, 1894) 64 Fed. 279. (3) That the plan requires the assenting general mortgage bondholders to sign the Olcott committee's agreement of May 7, 1894, providing for foreclosure, which committee has thus far been unable to obtain the consent of suffi- cient holders for that purpose, and which will thus obtain sufficient, if the plan should not become effective. (4) That the plan does not provide in advance for its success. (5) That it still leaves the companies in the hands of the receivers, subject to large unadjusted claims. (6) That it is insuffi- cient, and default will again occur at the end of the five-years extension, when the company will be depleted of assets. (7) That the receivers would have had means for payment of the general mortgage coupons and interest if they had not been improperly diverted therefrom. (8) That it affects liens not before the court, and charter rights not within its jurisdiction. (9) That the provisions for payment of commissions impair the obligation of the income mortgages, which limits the appropriations of earnings to other objects. (10) That the proposed price for the purchase of general mortgage coupons and interest and collateral trust bonds by the syndicates is inadequate. (11) That the provisions for the voting trust are illegal, re- ferring to Ohio & M. Ry. Co. v. State (Ohio Sup.) 32 N. E. 933. (12) That the court should first have a full accounting and statement of the compa- nies' affairs. (13) That the Philadelphia &. Reading Railroad Company does not need the authority of the court to make the agreements proposed by it. Mr. Bijur also argued that a foreclosure would be disastrous to the interests of the income mortgage bondholders and stockholders, while Mr. Dos Passos argued that the receivers' duty was to aid in winding up their trust, and having the property sold under foreclosure, as soon as possible.

This scheme, if successful, offers in substance to the receivers and the railroad company, for payment of the said claims of pressing indebtedness, the use of nearly $19,000,000, in the $9,000,000 from the five-years extension of the coupons and interest upon the general mortgage bonds, and $10,000,- 000 from the collateral trust bonds and income mortgage bondholders and stockholders upon the receivers and the company paying 6 per cent. interest upon those extended coupons and interest for five years from July, 1893, **and 2½ per cent. commissions upon the amount of the general mortgage**

coupons and interest thus extended, which the holders thereof will require the syndicate to take, and 2½ per cent. commission upon the amount of the collateral trust bonds; the success of the scheme requiring, and being contingent upon, the assent of sufficient of the security holders and stockholders to make it effective in the judgment of the committee and board of managers. In any event, whether of success of the scheme, or of foreclosure, because of the priority of the lien of the coupons and interest of the general mortgage bonds, and the receivers' certificates and the salvage of the securities pledged for the secured indebtedness and of the equipment, the debts which are proposed to be paid out of the said moneys to be raised would be payable out of the proceeds of the collateral trust bonds and their security, in preference to the income mortgage bondholders, unsecured general indebtedness, and stockholders. The coupons of the general mortgage bonds carry 6 per cent. interest from their maturity. Too small a part of those bonds are registered to warrant a discrimination against the small amount of interest thereon, which will not carry interest from maturity. The counsel for the receivers state that the equipment and the other well-secured obligations proposed to be paid also carry 6 per cent. interest. The collateral trust bonds proposed to be sold carry 5 per cent. interest. No substantial offer of better prices for the assets proposed to be sold in this plan was made, much less in the mode required by courts from parties opposing the consummation of judicial sales, in security for a substantial better price. The scheme, to be successful, will require from the syndicates and the security holders and stockholders substantially $9,750,000 from the collateral trust bonds and $10,000,000 from the funded general mortgage interest. It seems that the commissions provided for in the plan are not unreasonable in comparison with those which the present receivers have been authorized to pay in the following instances, to wit:

November 24, 1893:

    Speyer & Co—Loan of $3,000,000—Action of Receivers in payment of following commissions, etc., ratified:

| | |
|---|---:|
| April 24, 1893 | $30,000 |
| July 3, 1893 | 15,000 |
| November 25, 1893 | 6,000 |
| October 3, 1893 | 62,500 |
| January 3, 1894 | 25,000 |
| April 3, 1894 | 25,000 |

January 23, 1894:

    Tug International—Payment of 4½ per cent. commission to Philadelphia Warehouse Company for advance of $63,000 for three years—to be refunded monthly.

January 27, 1894:

    Philadelphia and Frankford Railroad Company—Issue of $250,000 bonds. Payment of $450 to Guarantee Trust Company for services as trustee, etc., and also commission of $5,000 to Pennsylvania Warehouse Company for purchasing unsettled claims amounting to $85,000.

March 2, 1894:

    Steam Tug and New Barges—Advance of $380,000 for five years to be refunded in monthly payments, commission of 5 per cent.

March 5, 1894:

    Coal Trust Certificates—Loan of $5,000,000 for ten years—negotiated at 97½ per cent.

It is not probable that under a foreclosure the collateral trust bonds or their security would produce more. It is the duty of the receivers appointed upon a bill of an income mortgage bondholder to pay or provide for the interest upon the general mortgage bonds, to avoid foreclosure under it. An investigation of the causes of the existing fact that the receivers have not the means to pay the present default upon the general mortgage interest, or the said other pressing indebtedness, will not aid the consideration of the present duty of the court and receivers, in the existing condition of those debts. So far as the petition asks action by the court and for authority to the receivers and company, it is entirely for the administration of certain assets in the receivers' hands for the payment of certain pressing debts, and that authority is to be contingent upon the subsequent approval of the

security holders and stockholders, all the parties in interest. That that administrative authority is asked thus contingently, and involves a partial adjustment of the affairs of the company, and a pro tanto reorganization, in aid of a complete reorganization, with a discharge of the receivers, when the remaining outstanding debts shall be thereafter the more easily settled, does not impair the jurisdiction or power of the court in these administrative functions. As was similarly said by the master in his nineteenth report in the case of Kelsey v. P. & R. R. Co., made April 1, 1885, if there were no other obstacle than the doubt as to the success of the plan, the receivers might be properly, in advance, authorized to consummate it, if it should prove effective. If the plan involved a complete reorganization and a discharge of the receivers, the authority asked for could await the consummation of the plan, but it is because the receivers are to continue that the plan becomes only one of administration, so far as the action of the court is concerned. The authority asked for is the same in character which was granted by Judge McKennan in Central R. R. Co. v. Lehigh & W. Coal Co., in the circuit court of the Western district of Pennsylvania, in its order of April 2, 1877, and September 7, 1878,[1] and which was given in the present case March 5, 1894, upon the twenty-ninth report of the master,[2] authorizing the issue of $5,000,000 6 per cent. certificates upon the security of the coal and coal accounts. Even looking at the plan in the aspect of reorganization, while it is the duty of the court and the receivers to be strictly impartial between rival committees, plans, and interests, and therefore in Chable v. Construction Co., 59 Fed. 846 (which was a stockholder's motion for an order on the receivers to permit him to inspect the company's books, to obtain material to convince other stockholders that they should oppose a proposed plan of reorganization which the receivers had commended, and who refused the inspection because the object of the petitioner was to defeat the plan), Judge Lacombe said in reference to that condition of things: "The theory of a receivership such as this is that the court takes possession of the assets of the corporation with the intention of distributing them equitably among all entitled to receive, without exposing creditors and stockholders alike to the heavy sacrifices which would be likely to occur should the property, as an entirety, be broken up and sold, bit by bit, as the result of a ruinous race of diligence between creditors. Having the securities in its possession, the court retains them until they can be properly marshaled, the claims of all ascertained, the property converted into money, and the same distributed equitably according to the rights of all parties. Frequently, before this termination of the proceeding is reached, some plan of reorganization, satisfactory to nearly all interested, and abundantly protecting the full legal and equitable rights of those not entering into it, is perfected, and the receivership terminates by a sale of the property to some new corporation, or to some committee organized under such plan." "Whether there shall be a new organization formed of stockholders, bondholders, or creditors, with what respective interests, and upon what terms, is one that shall be left for the determination of the interested, without interference in any way by the court or its officers. The court in these cases is a harbor of refuge, not a repair shop. It will hold the property of the corporation safe from outside attacks, and in proper cases will keep its business going, so that whatever value there may be in the business, qua business, may be preserved for all concerned; but it will not undertake, either itself or by its officers, to reorganize the old corporation, or to create a new one, or to solicit subscribers to some syndicate of prospective purchasers. If rival and discordant interests between the parties interested in the property produce conflicting

[1] These were orders made by the late Judge McKennan in the course of reorganization proceedings in the case of the Lehigh & Wilkesbarre Coal Company, of which no report has ever been published. By the order of April 2, 1877, the receivers were authorized to negotiate settlements with creditors having preferred claims, subject to the approval of the master. By the order of September 7, 1878, the receivers were authorized to make a composition with the Central Railroad of New Jersey, as its principal creditor, and to negotiate settlements with other creditors, with a view to the settlement and adjustment of the affairs of the company.

[2] Upon the entry of this decree, Isaac L. Rice made application to set aside the orders, and for leave to file a plea, demurrer, and answer, also to file nunc pro tunc exceptions to this report, which application was refused. He thereupon applied to the supreme court of the United States for leave to file a petition for a writ of prohibition and a writ of mandamus. The supreme court permitted briefs to be filed for and against the motion to file, and subsequently denied leave to file the petitions. In re Rice, 155 U. S. 396, 15 Sup. Ct. 149.

plans upon which they cannot agree, it is the receivers' duty to stand absolutely neutral between all, giving to no one any preference or advantage over the other, and according equal facilities to every stockholder, whether he holds a single share or ten thousand. And if the persons interested cannot within a reasonable time provide a purchaser, or competing purchasers of the property, the court will sell it, upon such advertisement. at such time. and upon such terms of sale, as courts usually adopt to secure competition and a fair price." And in Clark v. Railroad Co., Judge Jackson, and in Fowler v. Mortgage Co., Judge Lacombe, aie stated to have used similar language, although I have not had the opportunity of learning the questions and their conditions involved in those cases. And in the Kelsey Case, the master, April 1, 1885, upon the receivers' petition for authority to pay a coupon upon the convertible adjustment scrip of the railroad company, inter alia to help a scheme of reorganization, finding that the authority was not justified as an act of administration, added: "Neither am I satisfied that it is within the province of the court to intervene for the advancement of the negotiations of the party in interest for an amicable arrangement of the affairs of the corporations. As has been said by the court (opinion in matter of fourteenth report): 'A reasonable time should be afforded to the creditors and stockholders of the railroad company to mature a plan for the adjustment of its indebtedness.' But I think that in maturing any such plan they must be left to act for themselves, upon the situation as it exists, and that the court cannot be expected by directions to the receivers to assist them or to advance the views of any portion of them." Yet in Central Trust Co. v. Wabash, etc., R. Co., 25 Fed. 70, where, pending a receivership under foreclosure proceedings upon a railroad mortgage, the bondholders had formed a scheme of reorganization upon foreclosure and sale, and incurred expenses of advertising, etc., and the mortgage trustee petitioned the court for an order upon the objecting receivers to pay those expenses, they having no surplus funds for the purpose, Judge Brewer orally denied the application for that reason, stating also that there was no certainty that the scheme would be carried out, but adding that, if there were any surplus moneys in the hands of the receivers, perhaps there would be no impropriety in their advancing it; and in Pollitz v. Trust Co., 53 Fed. 210, the court confirmed a plan of reorganization which was made effective against a minority opposition. And a court of equity in foreclosure proceedings upon railroad mortgages, in view of the number and variety of persons and interests to be affected, and their probable sacrifice without combination for their protection, will facilitate combinations and schemes of reorganization to the end that a small minority of interests shall not enforce unreasonable and inequitable concessions from the majority, or the majority crush out or subject to disadvantage the rights of the minority. See Sage v. Railroad Co., 99 U. S. 334; Carey v. Railroad Co., 45 Fed. 438; Robinson v. Railroad Co., 28 Fed. 340; Cook, Stocks & S. (3d Ed.) § 886. The rights of a single minority security or stockholder are therefore not necessarily the same, whether in minority or majority, in view of those different relations.

Under the present petition there is no question of rival plans of organization. There is no other pending scheme to avoid the impending foreclosure. So far from the receivers acting, or this petition asking for authority, otherwise than with strict impartiality to the several interests involved, the refusal of the prayer of the petition would aid its opponents in depriving the whole body of the rest of the security holders and stockholders of the opportunity of approving and consummating the scheme, and the receivers have proceeded as follows, to wit: The Olcott committee having issued a circular to the security holders, stating: "The undersigned, at the request of a large amount of the above-mentioned bonds, have consented to act as a committee to take steps to procure the payment of the interest upon the bonds in cash, to resist any attempt to increase the principal of the mortgage debt, and, if necessary to accomplish these objects, to have the mortgage foreclosed, and to prepare a plan for the reorganization of the property;" and the Fitzgerald committee, a circular stating: "No one interested in the property can claim further delay or leniency from you. It is not proper that the property should remain in the hands of receivers indefinitely, and the committee is advised that the court having jurisdiction must soon intervene, and compel the adjustment of its affairs. If the receivers cannot pay the coupons upon the general mortgage bonds, you should take the property covered by the mort-

gage, which is believed to be fully ample to satisfy your claims; and the committee advises that it is the interest of the bondholders to forthwith demand an enforcement of their rights under the mortgage,"—the receivers, May 3, 1894, issued a circular, found at page 9 of "Exhibit A" hereto, to the stock and bondholders of the company, apprising them of the situation respecting the pending foreclosure, and stating: "But it should be distinctly understood that it is essential to the efficient and successful conduct of the business of the two companies that sufficient funds should be ultimately supplied in some way to protect the floating debt and equipment, as well as to pay the general mortgage interest. In the securing of this amount the receivers and management will unite with any body of creditors or shareholders to the best of their ability, and will cheerfully give the benefit of their assistance in any effort to make the burden of providing for it as light as possible." There being also two organized bodies representing income mortgage bondholders, of which Mr. Mertens and Mr. Hartshorne were respectively chairmen, the receivers, on May 7, 1894, wrote them as follows: "The receivers of the Philadelphia and Reading Railroad Company, as the more immediate representatives of the third preference income bondholders, at whose suit they, were appointed, and the management, as the representatives of the stockholders, have felt it their duty to do all in their power to pay or arrange for the interest upon the prior mortgages of the company; and with this view they have communicated, from time to time, with the holders and representatives of the holders of the general mortgage bonds, in order to secure their assent to the funding, or sale of their coupons, so as to avert the institution of foreclosure proceedings, and the imposition of any assessment upon the security holders represented by you. You are aware, however, that the two New York committees of general mortgage bondholders have declined to recommend the concession asked for, and have called for the deposit of the bonds, with a view to foreclosure. In view of this action, the undersigned beg to tender to your committee the assurance that they understand it to be their duty to give to your committee any assistance in their power, in the way of information, suggestion, or otherwise, and generally to co-operate, if requested, with your committee, and any other income mortgage bondholders or stockholders, in devising means to protect their interests. To avoid misapprehension, however, it should be added that they also understand that it is equally their duty to give like information to the holders of the general mortgage bonds and their representatives; and that the receivers, at least, are not called upon, or entitled to regard themselves as in any sense parties to any litigation that may be instituted. As the representatives of the corporation, the management will, of course, endeavor by all proper methods to protect the interests of the stockholders." And at the present hearing, Mr. Welsh, on behalf of the receivers, stated that if they could get from any responsible body any proposition that they believe to be for the benefit of the property, they would apply to the court to have it carried out. That the granting of the prayer of the petition may be misunderstood by the parties in interest, who are alone concerned, is not probable, and, if it were, that fact, or that they will thereby authorize the Olcott committee to foreclosure, should the plan prove unsuccessful, I do not think should prevent the action of the court otherwise proper. That the plan disposes of a large amount of assets, I do not think makes it unadvisable, as it also disposes of a commercially equal amount of indebtedness, which would, in any event, absorb the proceeds of those, or an equal amount of other assets. I do not think that any lien not before the court or charter rights will be affected without the consent of those interested, unless of a very small minority, whose rights would be necessarily entirely protected in the usual manner in such cases. I think that the provisions for commissions are only an element of the net price to be obtained for the assets to be disposed of, and do not impair the obligations of the income mortgages. I do not think that the provisions for the voting trust are a ground for objection to the granting of the prayer of the petition. Such a voting trust was held valid in the fully-considered case of Mobile & O. R. Co. v. Nicholas, 98 Ala. 92, 12 South. 723, and Ervin v. Railroad Co., reported in 7 Ry. & Corp. Law J. 87,[1] fully quoted with approval in Beech, Priv. Corp. § 306, and notes, decided in 1890 in the court of common pleas No. 2 of Philadel-

---

[1] The same case is reported as Shelmerdine v. Welsh, in 20 Phila. 199.

phia county, in which the opinion was given by Judge Hare, and Judges Fell and Pennypacker concurred, in which the plaintiff sought that court, as a court of equity by injunction, to prevent the voting trustees from casting the vote of the stock of the persons creating that trust; which case was approved by the supreme court in Com. v. Dalzell (Pa. Sup.) 25 Atl. 535, which case decided that the act of May 7, 1889 (P. L. 102), on this question, is merely declaratory of the prior law. See, also, Burgess v. Seligman, 107 U. S. 29, 2 Sup. Ct. 10. The bondholders, if they do not wish the benefit of the voting trust, can decline it. Non constat that any shareholder will object, and, if he should, the question will then arise, while the provisions of the general mortgage would enable its beneficiaries, through their trustee, on default, to take possession of and manage the property. I do not think that a full accounting, or a statement of all the affairs of the company, is necessary for the proper consideration of the questions involved in this petition. The Philadelphia & Reading Railroad Company is, of course, a proper party to the present petition, in view of its rights to be affected and obligations to be created, and of the injunction issued against it when the receivers were appointed.

Thomas Hart, Jr., and Samuel Dickson, for receivers.
Nathan Bijur, for Isaac L. Rice.
Hetty H. R. Green and Mr. Hartshorne, for committee.

DALLAS, Circuit Judge. At the time which had been appointed for hearing this petition, several counsel appeared on behalf of parties interested, but, owing to a change which the court had been constrained to make in the order of its general business, the discussion of this particular matter, though commenced, could not then be concluded. To avoid delay, and in supposed relief of counsel, some of whom were not residents of Philadelphia, I suggested to them that the petition might be referred to the special master, and that their arguments in the master's office could be stenographically reported; and I added that, if this course were adopted, those arguments would be considered on the coming in of the master's report, as if they had been made in court. This suggestion was accepted by all the counsel present, and thereupon the order of reference was made, and the master's report, including the arguments at length, has now been filed. Under these circumstances, I do not feel at liberty to comply with the request for a further hearing, which has been made in a letter addressed to me by one of the counsel who was a party to the arrangement I have mentioned. The case presented by the petition, and the contentions of those who oppose the granting of its prayer, must now be decided.

I have considered this application with more than ordinary care, for, with regard to some of the principles which counsel have invoked against it, as well as to the magnitude of the interests to be affected, it is one of especial importance; but full investigation and mature reflection leave me in no doubt as to the correctness of the conclusion reached by the master. To what he has submitted in support of that conclusion nothing need be added, but with respect to one subject, which has been urgently pressed upon my attention, a few words will be said to avoid all possibility of misunderstanding. The order now to be made does not approve the proposed plan of reorganization, nor is either approval or disapproval

thereof to be implied from it. The question of the wisdom and expediency of adopting any such scheme is for solution and determination by the persons interested, and no attempt to coerce their judgment or control their action should be made, either by the court or the receivers. But nothing of that sort is involved in the authority now asked and given. It imposes no constraint, but leaves those who have the right to accept or to reject the plan referred to, wholly free to do the one or the other as they may see fit. It sanctions the raising of money by rightful means, upon reasonable terms, and for proper objects; and it is not a valid ground of objection to it that it also renders feasible, in case of its due acceptance, the only reorganization project which is known to exist. The receivers should not enlist, on either side, in conflicts among those interested in the property they have in charge, but the neutrality which it is their duty to observe is not departed from by facilitating any plan which may be proposed for the general benefit, provided that to all alike, and with regard to every plan advanced in good faith, the same facilities be indifferently accorded; and the court, while it will not pass upon the comparative merits of rival schemes of reorganization, will regard with satisfaction any and every legitimate effort to terminate this receivership. It has now continued for nearly two years, and it will not be allowed to continue indefinitely. The appointment of receivers is an extraordinary remedy, and should be a temporary one. It is a beneficent one in many cases, but any unnecessary and futile protraction of the period of legal custody is, in any case, a grave abuse and a great evil. This is not said with reference to any particular plan of reorganization, but because I deem the present occasion a proper one for making it distinctly understood that if the parties in interest do not, within a reasonable time, devise some means for ending this receivership, the court will seriously consider whether it should not be dissolved. The order recommended by the master will be entered as the decree of the court.

(October 29, 1894.)

Since the foregoing was written and delivered to the clerk of the court, my attention has been called to certain exceptions on behalf of Henry H. Whitney, which I am informed had been filed about 30 minutes earlier. The points they present have been, in my opinion, sufficiently considered, and rightly disposed of; and it is to be noted that the learned counsel by whom they are interposed appeared and were heard before the master under the arrangement I have already fully stated, and all the arguments returned with the report have been carefully read and considered. Therefore these exceptions are dismissed.

Forty-Third Report of the Master.

And now, to wit, October 29, 1894, it is ordered that the Philadelphia & Reading Railroad Company and the receivers be, and they are hereby, authorized to enter into the agreements annexed to their petition filed September 25, 1894, respecting the plan for

the partial readjustment of the company's affairs, and, in case the plan be carried into effect, to make the payments therein stipulated for.